COPY

## STATE OF WEST VIRGINIA HUMAN RIGHTS COMMISSION

Patrick G. Spainhour,

      Complainant,

                                    Docket Number:

v.

Jefferson Volunteer Fire Department,

      Respondent.

### AMENDED COMPLAINT

    Patrick G. Spainhour

residing at: 514 22nd Street, Dunbar, WV 25064

charges Jefferson Volunteer Fire Department

whose address is   6313 MacCorkle Avenue SW, St. Albans, WV 25177

With an unlawful practice within the meaning of the West Virginia Human Rights Act (Art. 11, Chapter 5, Code of West Virginia) as amended, and specially within the meaning of Section (9) of said Act, because of my RACE__, RELIGION___, COLOR___ , NATIONAL ORIGIN____, ANCESTRY___, SEX__, AGE _X_, BLINDNESS__, DISABILITY__, or REPRISAL____.

Date of incident, on or about  April 19, 2021 – August 16, 2021

The facts on which the aforesaid charge is based are as follows:

I.    The Complainant, Patrick G. Spainhour, is a person within the meaning of W.Va. Code §5-11-3(a).

II.    The Respondent, Jefferson Volunteer Fire Department, is a person and an employer within the meaning of W.Va. Code §5-11-3 (a) and (d).

III.    The Complainant has initiated this complaint with the West Virginia Human Rights Commission alleging that he has experienced unlawful discrimination in violation of the West Virginia Human Rights Act because of his age (65).

IV.    It is alleged that the Respondent has violated the anti-discrimination provisions of the West Virginia Human Rights Act based upon the following information and in the following manner:

2

A. The Complainant is a member of a protected class.

&-12 11

B. On or about April 19, 2021, the Complainant joined the Jefferson Volunteer Fire Department as a volunteer firefighter.

C. Per physician's orders, the Complainant was required to wear an N-95 face covering while present at the station, due to risk of infection from the current pandemic, and presented the documentation to the Respondent. As a result, the Complainant received multiple questions and comments by other firefighters regarding his use of the mask.

D. In addition, the Complainant experienced age discrimination in the form of verbal harassment from his supervisor and co-workers when they would consistently call him names such as "PawPaw", refer to him as "accident prone", or describe certain tasks as "fairly complicated", despite his experience of 45 years as a firefighter.

E. The Complainant experienced disparate treatment when the Respondent failed to train him or allow him to operate certain apparatuses that were pertinent to his job as a firefighter, despite the fact that the Complainant had 45 years of previous experience.

F. The Complainant, in addition to a female firefighter, were often assigned menial tasks and what the Complainant described as "grunt work".

G. The Complainant contacted the fire chief, board members, and representatives of the state Fire Marshall to inform them of inconsistencies and the inappropriate actions taken by the Respondent that were observed by the Complainant.

H. The Complainant was subsequently subjected to adverse action when he was terminated on or about August 16, 2021. The reason for his termination by the Respondent was that the Complainant disobeyed the Respondent's wishes by contacting outside entities, such as the Fire Marshall, to seek remedies for problems within the department.

V. The Complainant has been discriminated against in violation of the West Virginia Human Rights Act because of his age (65).

I have not commenced any action, civil or criminal, based upon the grievance set forth above, except

_____

_____

STATE OF WEST VIRGINIA        )
                              )
COUNTY OF _Kanawha_           )

x _____
  (Signature of Complainant)

Patrick G. Spainhour, being duly sworn, deposes and says: that he is the Complainant herein; that he has read the foregoing complaint and knows the content thereof; that the same is true of his

own knowledge except as to the matters therein stated on information and belief; that as to those matters he believes the same to be true.

Subscribed and sworn to before me

this ___5th___ day of ___October___, 2021

x _____
(Signature of Complainant)

_____
(Signature of Notary Public or Attorney)

My Commission Expires: ___March 31, 20 5___

OFFICIAL SEAL
Notary Public, State of West Virginia
DONNA M. HARPER
5001 - Bankruptcy Trust
J Bancroft Hall
South Charleston WV 25303
My Commission Expires Mar. 31, 2025



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**

801 Market Street, Suite 1000
Philadelphia, PA 19107-3126
Direct Dial: (267) 589-9700
FAX (215) 440-2847
Website: www.eeoc.gov

January 30, 2023

Patrick G. Spainhour
514 22nd Street
Dunbar, WV 25064

Dear Mr. Spainhour:

This is in response to your request to this office of the U.S. Equal Employment Opportunity Commission (EEOC) concerning the charge of employment discrimination you filed against the Jefferson Volunteer Fire Department, EEOC Charge Number 17F-2022-00004.

Your charge was investigated by the West Virginia Human Rights Commission (WVHRC), which is a state agency. It does not come under the direct authority of the EEOC. However, to preclude duplication of charge processing, a worksharing agreement has been established between the EEOC and the WVHRC. Substantial weight is given to the WVHRC's findings in terms of acceptance by this agency.

We have reviewed the processing of your charge regarding your expressed concerns. Our review, including the information you provided, does not indicate a basis to change the disposition of the charge. If you wish to pursue your rights further, you may do so by filing in Federal Court using the Notice of Right to Sue issued to you on January 19, 2023. If you fail to file suit within 90 days of receipt of the original Notice, your right to file in these matters will be lost and cannot be restored.

Sincerely,

Damon A. Johnson
State Local and Tribal Program Manager



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Philadelphia District Office**
Legal Unit

801 Market Street
Penthouse, Suite 1000
Philadelphia, PA 19107-3127
Legal Unit Phone: (215) 440-2828
TTY (215) 440-2610
FAX (215) 440-2848

March 21, 2023

Patrick G Spainhour
514 22nd Street
Dunbar, WV 25064

Dear Patrick G Spainhour:

In accordance with your recent request for assistance in obtaining legal representation in connection with your EEOC charge, we are providing you with the names of all the attorneys participating in our Attorney Referral Program in your area which you may contact in seeking legal assistance.

When you visit your selected attorney(s) or law firm, you should take the following documents with you:

1)      A copy of this referral letter,
2)      A copy of the charge,
3)      A copy of the EEOC's Determination and/or Notice of Right to Sue

Note that if you have been issued a Notice of Right to Sue, you have 90 days from the day of receipt to file a lawsuit or you will lose your right to sue.

Sincerely,

*Emily Ramirez Soto*

Emily Ramirez-Soto,
Paralegal Specialist

(Enclosure/s)

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Philadelphia District Office
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

**To:**    Patrick G. Spainhour
514 22nd Street
Dunbar, WV 25064

**Re:**    Patrick G. Spainhour v. JEFFERSON VOLUNTEER FIRE DEPARTMENT
EEOC Charge Number: 17J-2022-00004

EEOC Representative and email:    State Local and Tribal Program Manager
PHLSTATEANDLOCAL@EEOC.GOV

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC has adopted the findings of the state or local fair employment practices agency that investigated your charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) received this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough  1/19/2023
Karen McDonough
Deputy District Director

cc:    For Respondent

Robbie Nutter
Chief
Jefferson Volunteer Fire Department
6313 McCorkle Avenue, SW
Saint Albans, WV 25177



## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.  If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**.  Receipt generally means the date when you (or your representative) received the document.  You should **keep a record of the date you received this notice**.  Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Filing this Notice is not enough.  For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

7

PATRICK G. SPAINHOUR
    COMPLAINANT,

v

                            DOCKET #:  EA-62-22

JEFFERSON VOLUNTEER FIRE DEPARTMENT
    RESPONDENT.

## CERTIFICATE OF SERVICE

I, **TIA L. WELCH, Executive Director**, of the West Virginia Human Rights Commission, do hereby certify that I have served the enclosed *LETTER OF DETERMINATION* upon:

| Complainant | Attorney/Respondent Contact |
|---|---|
| Patrick G. Spainhour<br>514 22nd Street<br>Dunbar, WV 25064 | Chief Robbie Nutter<br>Jefferson Volunteer Fire Department<br>6313 MacCorkle Ave., SW<br>Saint Albans, WV 25177 |

By mailing a true copy thereof by United States Mail, on the  15th    day of December 2022.

                    BY: _____

                              Tia L. Welch
                           Executive Director

TLW/lrb

**STATE OF WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN RESOURCES**
**HUMAN RIGHTS COMMISSION**
1321 Plaza East, Room 108A
Charleston, WV 25301-1400
Ph: (304) 558-2616   Fax: (304) 558-0085
Toll-free: 1-888-676-5546   Web: www.hrc.wv.gov
Tia L. Welch, Executive Director

## IN THE MATTER OF:

PATRICK G. SPAINHOUR
    **COMPLAINANT,**

v

                      **DOCKET #:  EA-62-22**

JEFFERSON VOLUNTEER FIRE DEPARTMENT
    **RESPONDENT.**

**DATE COMPLAINT DOCKETED:** 10/7/2021

**DATE COMPLAINT SERVED:** 10/7/2021

## LETTER OF DETERMINATION

    Under the authority vested in me by the West Virginia Human Rights Act, as amended, I issue, on behalf of the West Virginia Human Rights Commission, the following determination regarding the subject complaint.

9

The above-named Complainant previously filed a complaint against the above-named Respondent, alleging employment discrimination in violation of the West Virginia Human Rights Act, as amended. Respondent has filed an answer denying, at least in part, the allegations of discrimination. Officers of the West Virginia Human Rights Commission (WVHRC), pursuant to W. Va. Code §§ 5-11-8 and 5-11-10 and the Rules of Practice and Procedure before the West Virginia Human Rights Commission, W. Va. Code R. § 77-2-4, have conducted an investigation of the allegations in the complaint and the answer.

The information obtained in this investigation does not substantiate the claim of discrimination. Accordingly, the West Virginia Human Rights Commission hereby makes an initial determination, based upon its investigation, that there is **NO PROBABLE CAUSE** to believe there has been a violation of the West Virginia Human Rights Act. The WVHRC proposes that this administrative complaint be dismissed.

ENTERED this 15th    day of December 2022.

**ON BEHALF OF THE WEST VIRGINIA HUMAN RIGHTS COMMISSION**

BY: _____

**Tia L. Welch**
**Executive Director**

/0

# BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

PATRICK G. SPAINHOUR
### COMPLAINANT,

v

                                **DOCKET #:  EA-62-22**

JEFFERSON VOLUNTEER FIRE DEPARTMENT
### RESPONDENT.

                        **EEOC DOCKET NUMBER:  17J-2022-00004**

## <u>NOTICE OF RIGHT TO SUE</u>

| <u>COMPLAINANT</u><br>Patrick G. Spainhour<br>514 22nd Street<br>Dunbar, WV 25064 | <u>ATTORNEY/CONTACT PERSON</u> |
|---|---|

      This is your **NOTICE OF RIGHT TO SUE.**  It is issued pursuant to the requirements of West Virginia Code §5-11-13(b), as amended, which provides that a Notice of Right to Sue be issued upon the dismissal of a Human Rights Commission complaint for any reason other than an adjudication of the merits of the case.

      Your case has been dismissed by the West Virginia Human Rights Commission because: (1) The Commission found no probable cause upon your complaint, (2) you elected not to proceed with your complaint at the Commission, or (3) an administrative closure was proper.

# BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

**PATRICK G. SPAINHOUR**
**COMPLAINANT,**

**v**

**DOCKET #:  EA-62-22**

**JEFFERSON VOLUNTEER FIRE DEPARTMENT**
**RESPONDENT.**

### FINAL DETERMINATION AND DISMISSAL ORDER

On September 21, 2022, the Complainant was informed by the Commission of its Notice of Proposed Dismissal finding in the above-captioned matter. The Complainant made a timely request for review of this ruling pursuant to Rule 4.14 of the Rules of Practice and Procedure before the West Virginia Human Rights Commission.  A Review of the proposed dismissal was convened on **October 26, 2022.**

Following the Commission's administrative review, the Commission determined a No Probable Cause in the above referenced matter.

Wherefore, it is hereby ***ORDERED*** that this matter be, and it is hereby ***CLOSED*** and **DISMISSED** from the docket of the West Virginia Human Rights Commission.  A Notice of Right to Sue shall be issued forthwith.

ENTERED this  15th day of December 2022.

WV HUMAN RIGHTS COMMISSION

BY:_____
Tia L. Welch
Executive Director

**TLW/lrb**

12

Pursuant to W. Va. Code §5-11-13 (b) and this letter, you are authorized to institute a civil action based upon your Human Rights claim against the responding entity, at any time within **ninety (90) days** following the mailing date of this notice (postmark), or, **if the statute of limitations on your claim has not expired at the end of that ninety-day period**, at any time until the statute of limitations runs out on your claim. Your civil action should be filed in the circuit court of the county where the Respondent resides or transacts business.

If you do not have an attorney, you may contact the West Virginia State Bar, Lawyer Referral Services, Capitol Complex, Charleston, West Virginia 25305, telephone number: (304) 558-7991 for referrals.

If you have any questions about your rights under this Notice, please contact James A. Spenia, Lead Investigator, West Virginia Human Rights Commission, Room 108A, 1321 Plaza East, Charleston, West Virginia 25301-1400, telephone: (304) 558-2616, facsimile: (304) 558-0085.

**Entered this 15th   day of December 2022.**

**WV HUMAN RIGHTS COMMISSION**

BY: _____

**Tia L. Welch**
**Executive Director**

**TLW/lrb**

13

JEFFERSON FIRE DEPARTMENT
MEMBERSHIP ROSTER
2021

| NAME | UNIT # | CONTACT NUMBER |
|---|---|---|
| **OFFICERS** | | |
| CHIEF JON VANDERGRIFF | 1901 | 304-550-8068 |
| ASST. CHIEF ROBBIE NUTTER | 1902 | 304-419-2525 |
| CAPT. COREY SMITH | 1904 | 304-542-2340 |
| LT. TERRELL LOVEJOY | 1906 | 304-435-5640 |
| VACANT | 1907 | |
| **FIREFIGHTERS** | | |
| DAN TAAFFE | 1910 | 304-421-3131 |
| MATT ROUSH | 1911 | 304-542-3287 |
| BILLY JOHNSON | 1913 | 304-982-0503 |
| JACOB WEBSTER | 1914 | 304-419-3066 |
| TJ KIDD | 1915 | 304-610-6190 |
| JOE HARRIS | 1917 | 304-932-6707 |
| JOEY ROUSH | 1918 | 304-421-3517 |
| MARK SCHOOLCRAFT | 1919 | 304-989-4080 |
| ALEXANDRA KIDD | 1920 | 304-541-0210 |
| DYLAN BURFORD | 1921 | 304-785-4520 |
| CHASE PETRY | 1922 | 304-993-6639 |
| CALEB CHILDRESS | 1923 | 304-993-4045 |
| CHAD SMARR | 1924 | 304-965-4550 |
| PAT LIVELY | 1925 | 304-767-8695 |
| ANNA FORD | 1926 | 304-419-6816 |
| PATRICK SPAINHOUR | 1927 | 304-543-8917 |



# JEFFERSON VOLUNTEER FIRE DEPT.

## 6313 MACCORKLE AVE. SW

## ST. ALBANS WV 25177

TO: Patrick Spainhour

RE: Termination

From: Chief Jonathan B. Vandergriff

Date: 11, August 2021

Patrick it has been brought to my attention that over the last several weeks you have contacted Bradley Scott with the WV State Fire Marshalls Office, CW Sigman with Kanawha County Emergency Management. About me not issuing you an EV permit for your POV. You have showed up to my place of employment and also contacted Virgil White who sits on the Fire Commission Board while he was on duty at his regular place of employment, and wrote a letter to the Board President of JVFD on this same issue.

Patrick your application was accepted on 04/19/2021 all new members serve a 6 month probationary period in which you must stay in good standing with the department.

Patrick you had been verbally warned on 08/02/2021 about these issues by myself, Asst. Chief Nutter, and Captain Smith. Firefighters are not to contact county and State officials over personal issues and then you called Virgil White about this same issue on 08/10/2021.  I am the Fire Chief and I have the final say so to weather or not someone in issued an EV permit because I am ultimately responsible. Your behavior on this matter is unacceptable and I am hereby relieving you of your duties, your services are no longer needed at Jefferson Volunteer Fire Department.

Fire Chief
Jonathan B. Vandergriff: _____  Date: 08/11/2021

Asst. Chief Robbie Nutter: _____  Date: 08/16/2021



**STATE OF WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN RESOURCES**

HUMAN RIGHTS COMMISSION
1321 Plaza East, Room 108A
Charleston, WV 25301-1400
Ph: (304) 558-2616    Fax: (304) 558-0085
Toll-free: 1-888-676-5546    Web: www.hrc.wv.gov
Tia L. Welch, Executive Director

February 22, 2022

Patrick G. Spainhour
514 22nd Street
Dunbar, WV 25064

Re: EA-62-22
Patrick G. Spainhour v. Jefferson Volunteer Fire Department

Dear Mr. Spainhour:

Enclosed you will find **RESPONDENT'S POSITION STATEMENT** filed by the Respondent. This Reply is the Respondent's answer to your charges in your Complaint. In it, the Respondent gives its side of the story and attempts to show why its actions are not discriminatory.

**Although hiring a private attorney is not required, if you _have_ hired one, you should now immediately provide your attorney with a copy of this letter and Respondent's reply.**

Please look over this statement and identify any points where you disagree with Respondent's reply. Your assistance is vital to our investigation. Your input will help us evaluate the information we receive from Respondent and assist the Commission's ultimate determination in this matter. If you do not provide us with a response to the enclosed reply, we will have to move forward without the additional facts you could have provided and without knowing whether you agree or disagree with the specific assertions made by the Respondent.

If you know of evidence that you have not yet brought forward, please tell us about it now. The Investigator will use the information you provide to evaluate your complaint and to find other documents, witness statements, or the like, necessary to decide the issues.

16

In considering evidence to submit, some guidelines may be useful. You should identify any documents which will support your charges or show the Respondent's statements to be incorrect. If there are any witnesses you believe the Commission should speak with, please send us their names, contact information (telephone number and address), and a brief explanation of what information they may have that would be helpful to this investigation. Witnesses should be persons who have **directly** seen or heard something which will support your charges or show the Respondent's position to be incorrect. Please do not include character references. Normally, general character references, (persons who would tell the Commission good things about you personally, but do not have any first-hand knowledge of the facts of your case), are not useful and may slow the handling of your case.

Comparisons are especially helpful. One way to show discrimination is to point to other persons you believe were treated differently by Respondent than you were. For example, if your claim is one of discrimination on the basis of race, and you believe members of another race were treated differently than you were, please give us as much information as possible about *who* was treated differently and *how* they were treated differently than you. The Commission will investigate this information and determine what effect, if any, this information has on your charge of discrimination.

Your answer need not be formal. A simple handwritten letter is good as long as it is readable. Please get your response to me within ten (10) days after you receive this letter. If you have questions, I may be contacted at (304) 558-2616 between 8:30 a.m. and 4:30 p.m. weekdays or you can email me at james.a.spenia@wv.gov.

Sincerely,

James A. Spenia
Lead Investigator

Enclosure



# JEFFERSON VOLUNTEER FIRE DEPT.

## 6313 MACCORKLE AVE. SW

## ST. ALBANS WV 25177

Mr. James A Spenia

Mr. Patrick Spainhour was terminated from the Jefferson Volunteer Fire Department, due to numerous reasons. Mr. Spainhour had made several phone calls to county and state officials requesting that they make previous Fire Chief Jonathon Vandergriff issue him an emergency vehicle permit. Chief Vandergriff and I at the time Assistant Chief Robbie Nutter, explained to Mr. Spainhour that EV permits were an a honor that the Fire Chief could approve or not approve. Also, according to the rules and regulations of the Jefferson VFD that only a member who is off from probation and a member of the fire department for one year would be granted and EV permit.

Currently the Jefferson Volunteer Fire Department has four active members who are over the age of 40. These members are permitted to drive and engage in fire fighting activities. Mr. Spainhour was not treated any differently than any other member of the Jefferson VFD.

We also encouraged all our members who wanted to wear a face mask while at the fire department. We understand that many of members chose not to wear a mask while at the fire department. We did not require mask during the time Mr. Spainhour was a member of the department.

Regarding nicknames given in the fire service. Some people who have been in the fire service for a while maybe called "Pappy" could be considered a badge of honor. With Mr. Spainhour being one of the oldest members at the time the guys would call him pawpaw. There was nothing intended to be discriminating on his age. Mr. Spainhour never came to any of the officers of the fire department complaining about this. If Mr. Spainhour would have, we would have put a stop to it. Also, if it would have been an ongoing issue the firefighter or officer would have been disciplined accordingly.

Also, all of this took place under the old administration. Our administration currently changed on 12/27/2021. Attached you find a copy of Mr. Spainhour's termination letter and the rules and regulations on emergency driving permits. If there are any questions you can contact me at the below telephone numbers or email address.

Officer Number: 304-768-0711

Cell: 304-415-2535

Email: robbienutter1903@outlook.com

Sincerely Fire Chief Robbie Nutter

FILED

FEB 16 2022

WV HUMAN RIGHTS
COMMISSION

16

Patrick G. Spainhour

514 22nd Street

Dunbar, WV 25064

Re: Jefferson Volunteer Fire Dept. EA-62-22

Dear Mr. Spenia:

In response to Robbie Nutters attempt to show why his actions are not discriminatory he has, I believe, also, not only provided myself along with the Human Rights Commission information that will not only show age discrimination but in that he, along with Jefferson Volunteer Fire Dept., has violated my Civil Rights, that is, the right of a citizen to contact their government representatives and is in fact guilty of retaliation against me leading to my discharge due to my valid concerns along with whistle blowing. Retaliation.

Mr. Nutter states that I was terminated from the Jefferson Volunteer Fire Dept. due to numerous reasons, so I ask what were those reasons? Concerning the Emergency Vehicle permit the former Chief Vandergriff was instrumental in me applying for a permit, he in fact had discussed this with me and signed the permit request, of which I mailed and was approved for me and sent back to the chief to give to me. In the mean time I generated a letter to the City of Dunbar Mayor's office and asked the mayor to notify the Chief of Police and the Fire Chief that I would be responding code to emergency calls stating the route that I would take to get to Jefferson Volunteer Fire Dept, this was done as a courtesy notification; I believe that this what lead to, in my opinion, the Chief and Mr Nutter played the we don't know where the permit is, "it's in the Chief's office" said Nutter, "and we can't go in there", around fifteen minutes later Nutter was in Chief's office helping a person to fill out an application, and pretended to look for the permit. At a later date I asked Nutter about the permit and he said that Chief had the permit in his vehicle, and he

was at work. At some time, latter (weeks) I was called into Nutters office where captein Smith and him were. Nutter attempted to explain that the Emergency Permit was an honor or privilege this while adlibbing from their rule book, that I had to be there for a greater time period and off probation; I then asked Nutter why the Chief approved the permit by signing it and allowing me to have it processed? He had no real answer. The Chief had Chief's privilege to issue it to me, I believe that he did this because of the fact that I was already trained as a firefighter, a (certified Fire Fighter) and saw the benefit of allowing me this tool so that I could better serve the Fire Dept. and Jefferson Community.

As far as the four other member that were over the age of forty, I never heard him call them Pappy or any other derogatory names, he reserved that explicitly towards me, others would often call me "Sir". As far as complaining to the management about it? We all know that that would have only increased and expanded the problem; in fact, it was Nutter himself that was the culprit. "The pot calling the kettle black"

Concerning my face mask, it was required by my doctor's order, of which I included in my training paper that I turned in to the Fire Dept'. Nutter would catch me in front of Fire Dept members and say," I can't here you!", to belittle me. Nutter stated in his letter that we encouraged all of the members who wanted to were a face mask while at the fire dept and that many of the members chose not to were one. The Government or another agency had provided N-95 mask to them, they were in or on at least one of the fire depts' vehicles(s) collecting dust. The problem is according to the Governor's executive order 50-20, dated July 6th 2021, it was stated in paragraph two number 1.. That all individuals 9 years old and over within the State of West Virginia shall were an adequate face covering when in confined, indoor spaces. (It would make sense also wile inside a Fire Dept vehicle) that a mask should be worn, (the provided N-95's) this would have helped protect not only the fire fighters but their family's and the public. often on meeting/drill nights the fire dept members would share meals, setting shoulder to

3   20

shoulder and at least once with a visiting fire dept' at the station. Due to the exposure of members to pathogens on their fire, rescue and medically oriented call(s)/responses. mask should of been worn, however this was not done. I believe that any reasonable fire officer and fire dept. would have enforced this by themselves and would have not been an option.

Nutter goes on to mention that, "this took place under the old administration" however he seems to blame and state second and third parties when in fact it was for the most part him in this undertaking. I believe this was done to get me to quit on my own so that they would not have to deal with the alleged infractions that are yet to be properly disclosed. I would think that if all of the members that were on the Dept at the time were asked about how I functioned and my attitude were disclosed it would be a positive outcome for me. (roster provided)

Addressing the paperwork that Nutter turned into back up his statements, I thank him for helping me to justify my complaint, that is it's like a police officer arresting a person and then trying to find laws after the alleged fact.

Addressing as follows the Membership paperwork:

c) Training drills. I attended every drill and full participated in those drills.

D) All members will be assigned to a fire apparatus for Monday night inspections.

It was usually me and Anna Ford who were tasked with checking the portable equipment, and air-packs even though it was assumed that I knew the what and how to. I however saw very few vehicles' fluids checked by their drivers on drill nights. A number of units had collusion damage.

How strange it was when I was asked to pump their newest truck on a fire, and did so properly, not the same that I had observed for others before and after I joined. I put

9   21

100% of my effort into this fire dept, and spent hundreds of dollars directly and indirectly in its support. Before the fire officers knew about my letter to the board, (which was informative and not condescending), surprisingly I found out during a meeting that decent already existed, other fire depts were talking as well as other members and Chief Vandergriff wanted to know of any one who was talking, and stated that "there eating our food on meeting nights"

i) New members will have one year to take and complete required training.

I already had all the necessary training, but would keep learning. I am qualified WVU adjunct Fire Instructor, a WV State Certified firefighter as well as a WV State Journeyman Firefighter..............

x) All members of the fire dept. will be issued a copy of the Standard Operating Procedures (SOP) Any time a procedure has been revised a copy will be issued to each member. Each member will be required to update their issued copy.

Where's the beef? I never was given a copy of the SOG's nor were they gone over with me, my first exposure was when Nutter, (at that time the Asst.Chief) sat in his office with Capt. Smith and adlibbed the rules on the Emergency Vehicle Permit trying to justify why, after Chief Vandergriff approving it and the State issuing it, then not turning it over. Chief Vandergriff and I had discussed me getting one. I told Chief that I wanted to get my truck checked out before responding, he said OK and later signed the permit and the State approved it. The question is once the State approves any permit can anyone but the state keep that person from applying it? I know that a Chief or the Fire Marshall's office can, once the permit is applied to a vehicle (as long as properly justified), have the permit canceled and removed from that vehicle The day I was discharged from the fire dept there was one person who has a disabled driver permit to hang on their mirror, he

has a EVP ( the fire depts chief driver and pump operator) and there was another firefighter who had redlights and siren on their vehicle responding for years while on Jefferson Fire Dept without a EVP, is it possible that these people have special privilege rules that don't apply to others?

Nutter claimed that he told me not to contact a number of officials. was this a threat? I believe this was a after the fact statement. Chief Vandergriff told me not to contact Kanawha County EMS and at first didn't until things became puzzling. As for me trying to force the turnover of the EVP, not so, I just asked what my rights were so I could do my job and be productive. I was only able to be on a fire apparatus a few times. If I had had the EVP, I could have been at least on the second truck out. Although not being allowed to drive I certainly could have pumped the engine and freed up a firefighter to fight fire etc. "O they were too complicated for me?" I believe that Nutter had suggested this statement in-kind to me.

Since no rules/SOP's were given to me and it would appear that an outside agency is helping Nutter, presenting him with the requirements for Vehicle operators (age 65 and other should not be permitted to drive ) after the fact to try to justify my expulsion, and giving special privilege to a documented disability placard/permit caring potential handicapped person, and allowing them to drive and operate and pump a fire apparatus (not to manufacturers guidelines and rules) and not myself whom is not handicapped and is a W.V. certified firefighter. It is difficult to grasp why Nutter in both the Assistant Chief's position and now the Chief's, justify this, and deny me the opportunity to prove my worth as I would meet the guidelines positively when addressing the (Requirements for Vehicle Operators age 65 and older). It is also difficult to understand how a second firefighter is able to respond with redlights and siren without a permit for years and Nutter not be knowledgeable of it as an officer.

6    23

Accident prone: It was months ago at Jefferson Fire Dept when I stepped out from in between a firetruck in the bay that I heard Chad Smarr telling TJ Kidd and his wife Alexsandra Kidd that I was accident prone, I told him that was inappropriate, later I remembered that around 2015, wlie I was responding to a auto crash on I-64 West I was pulling off the road to investigate a potential crash and a vehicle hit me in the rear, drove me into another pickup and totaled my vehicle and injured me, I believe that it was his girlfriend and then later wife, Mr Smarr is the person that has a disability placard/permit, and has lights and siren on his vehicle, has a EVP and drives and pumps Jefferson's firetrucks (I observed him directly not following the manufactures guidelines/rules and informed Assistant Chief Nutter. I have studied the manufactures guidelines and rules of operation) I also brought this up in my letter to the board.

I am including my letter to the board of Jefferson Fire Dept., a copy of the Governor's Executive Order NO. 50-20, a copy of a Legislative audit done in 2018 concerning a violation of W.V. Code 8-15-8b. (misuse of funds), a copy of the signed contractual agreement between KCEAS and Jefferson Fire Dept after the fact, (all for information purposes), and the roster of Jefferson Fire Dept 's membership while I was there, feel free to talk to them if they are willing to talk.

Very truly yours,

Patrick G. Spachhous, NRP, RN, CPhT, HM1 USNR-R

24

# MacCorkle Lavender PLLC

300 Summers Street, Suite 800 • Post Office Box 3283 • Charleston • West Virginia • 25332.3283
Phone (304) 344-5800 • Fax (304) 344-8141

Email Address: [illegible]

March 10, 2022

Patrick Spainhour
514 22nd Street
Dunbar, West Virginia 25064

RE:    *Kanawha County Emergency Ambulance Authority Initial FOIA Response*
       *"Rapid Responder" Information*

Dear Mr. Spainhour:

The Kanawha County Emergency Ambulance Authority ("KCEAA") is in receipt of your Freedom of Information Act Request ("FOIA") dated February 25, 2022, sent via Certified Mail to Monica L. Mason. Please let this correspondence serve as the KCEAA's acknowledgement of your request received by Ms. Mason on March 3, 2022.

Your request has been reviewed and a determination has been made regarding the identification of the appropriate custodian(s) of the records at issue. The KCEAA currently has a Memorandum of Understanding for the "Rapid Responder" program with Jefferson Volunteer Fire Department as of August 9, 2021, please see attached.

The KCEAA does not have in its possession any patient records as outlined in your request. However, pursuant to applicable laws and regulations documents responsive to this request could not be produced without a valid HIPAA release.

Rapid Responders who are compliant with the terms of the MOU may be provided certain minimal equipment and/or supplies depending on the resources available. Requests for supplies are reviewed along with provided patient run logs for accuracy and need pursuant to the MOU.

The KCEAA charges $0.40 per page copied and a search fee of $20.00. Please forward payment in the amount of $21.20 for the provided information. All such payments should be mailed to the KCEAA as follows:

> KCEAA
> Attn: Monica Mason, Executive Director
> 601 Brooks Street
> Charleston, WV 25301

With this letter, the Kanawha County Emergency Ambulance Authority's responsibility to respond to your request has concluded. You may institute proceedings for injunctive or declaratory relief in the Circuit Court of Kanawha County should you disagree with this determination.

A FFREY-06173 Doc. # 1335

Patrick Spainhour
March 10, 2022
Page 2


Should you have any questions or wish to discuss this matter further, I can be reached at the above address, by telephone at (304) 344-5600, or by e-mail at ................... I look forward to speaking with you in the future.


Very truly yours,



Carrie A. Dysart


CAD/pl

cc:     Monica Mason *(via email)*

ATTREF-06173 Doc. # 1205

FREEDOM OF INFORMATION REQUEST

CERTIFIED MAIL NUMBER: _____
RETURN RECEIPT REQUESTED

Patrick Spshhour
504 22nd St
Dunbar, West Virginia 25064

02/25/2022

Kanawha County Emergency Ambulance Authority
Administration
Director in charge
601 Brooks ST Charleston, WV 25301
601 Brooks, ST
Charleston, West Virginia 25301

RE: Freedom of Information Act Request

Dear Director:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552, the Privacy Act 5 U.S.C. §552(a) and West Virginia Freedom Of Information Act §29-1-1 Et Seq, I am requesting, by way of this letter, an opportunity to either inspect or receive copies of Requesting copies of the last two contractual agreements for Rapid Responder or those covering 2020 to 2022 for Station 20? (Jefferson Volunteer Fire Dept.) second redacted medical reports turned in by Station 19 (Jefferson VFD) for those years. Third type of supplies issued to run those rapid responder calls such as but not limited to... Medications, oxygen, o2 adjuncts, airway BVM's and other medical supplies specific to a Rapid Responder liquad, such as was issued by KCEAA . Please mail the information to the aforementioned address.

In the event that a fee shall be incurred for either searching or the copying of these documents or records, please inform me of the cost. However, if the cost exceeds $100.00, I would also like to request a waiver of all fees as the disclosure of the requested information is for my own personal use and knowledge and/or in the public interest and will contribute significantly to the awareness and/or understanding of the information contained within the aforementioned document(s) and/or files. This information is not being requested or sought after in any commercial purposes.

This information should not be subject to any exemptions of the Freedom of Information Act (FOIA), and access to the requested document(s) should be granted within twenty (20) working days.

I also request that if you determine that any part of the information requested is exempt from the FoIA, this information be identified by document. I request that you provide the statutory basis for your claim and your reasons for not exercising your discretion to release this information. FOIA also provides that if any portions of the file are exempt from release, the remainder of the file must be released. Therefore, request that I be provided with any and all non-exempt portions that can reasonably be segregated.

In the event that you are unable to provide the information requested, please let me know so that further arrangements or appeals can be made.

Thank you for your time and cooperation in this matter.

Sincerely,

_____
(Affiant Signature)

26

KANAWHA COUNTY EMERGENCY AMBULANCE AUTHORITY
"RAPID RESPONDER MEMORANDUM OF UNDERSTANDING"

This Agreement, entered into this 6th Day of August, 2021,

By and between the

KANAWHA COUNTY EMERGENCY AMBULANCE AUTHORITY,

A public corporation, hereinafter referred to as the "Authority", party of

The first part, and

JEFFERSON VOLUNTEER FIRE DEPARTMENT

Party of the second, hereinafter referred to as "Rapid Responder"

RECITALS:

The Authority is a public corporation pursuant to the provisions of Article 15, Chapter 7, of the Code of West Virginia of 1931, as amended by the Emergency Medical Services Act and by orders of the Kanawha County Commission. Pursuant to the Emergency Medical Service Act of 1975, as amended and the orders of the Kanawha County Commission, the Authority is charged to provide Emergency Medical Service to the citizens of Kanawha County and may enter into contracts and agreements which are necessary, convenient, or useful to carry out the purposes of the Act with any person, public corporation, state, or any agency or political subdivision thereof, to aid in the establishment and maintenance of an adequate emergency system for the entire county.

WITNESSETH

Now, therefore, in consideration of the mutual covenants and promises contained herein and the mutual benefits to be derived therefrom, and in furtherance of the objectives as established by the Emergency Medical Services Act of 1975 and subsequent laws, the parties first mentioned above do hereby agree as follows:

In order to provide prompt assistance in life threatening incidents in the interest of the patients and the Authority, as the provider of Emergency Medical Services, to enter into agreement with state certified Fire Departments to provide qualified first responder personnel and equipment to stabilize the patient until the arrival of the Authority's more advanced service. This role shall be known as the Rapid Responder according to the following terms of this Agreement.

1. INDEPENDENT CONTRACTOR: The parties to this Agreement intend that the relationship between them created hereunder is that of an independent contractor. As an independent contractor, no agent or employee of the Rapid Responder shall be deemed to be the agent or employee of the Authority nor shall any agent or employee of the Authority be deemed to be an agent or employee of the Rapid Responder. None of the benefits provided by the Authority to its employees are available from the Authority to agents or employees of the Rapid Responders nor shall any benefits provided by the Rapid Responder to its agents or employees be available from the Rapid Responder to the employees of the Authority. Nothing herein is intended, nor shall it be construed, to create a partnership, an employer-employee relationship, a joint venture, or a relationship of landlord and tenant between the Authority and the Rapid Responder. The Authority and the Rapid Responder shall be solely and entirely responsible for its acts and the acts of its agents and employees.

2. TRAINING AND MEDICAL DIRECTION: The Authority will, subject to the availability and distribution of its resources financial and otherwise, assist in providing training to Rapid Responder personnel who are certified at least as an Emergency Medical Technician – Basic ("EMT – B") and approved with the minimum level of a state approved Rapid Responder training. The Authority and the Rapid Responder will follow all rules and regulations set forth in 64CSR48. It is anticipated that there will be monthly training sessions scheduled for such personnel on

27

selected nights in various locations that are convenient for Rapid Responder's personnel. Training provided by the Authority is anticipated to consist of a minimum of forty hours a year. The Rapid Responder's personnel shall maintain a current and valid Certification of Training during the term of the Agreement and shall continue education and skills practice to ensure professional performance levels. Rapid Responder's personnel are expected to avail themselves of continuing education program offered by the Authority. All Rapid Responder personnel must provide the Authority with up to date certifications and qualifications. The Authority shall provide overall medical direction to the Rapid Responder consistent with the scope of practice and other protocols and requirements described in 64CSR48. Rapid Responder personnel shall abide by the Authority Medical Director's guidance, medical practice, and procedures set forth consistent with individual levels of training and certification.

3. ALERTING: The Authority shall authorize the alerting of the Rapid Responder through the Metro Emergency Communication Center or by special arrangement of incidents in the area covered by the Rapid Responder. The Authority shall retain sole determination of applicable response situations. the procedures to be used, and methods by which the program is to be accomplished in accordance with protocols pre-established jointly by the participating Rapid Responder and the Authority. The Authority may provide an alternate means for alerting the Rapid Responder depending on the degree of need for that geographic area and available financial or equipment resources. Rapid Responder must be capable of responding to an incident with in five (5) minutes of being alerted unless they are already on a call.

4. DUTIES OF RAPID RESPONDER: The Rapid Responder's responsibility is to respond when called and to provide ONLY Basic Life Support Stabilization to a life-threatening situation until the arrival of the Authority or Authority personnel, after which all patient care will be under the direction and control of the Authority. Upon the arrival of the Authority's personnel, the Rapid Responder's role shall continue only as an assistant to the Authority's personnel. After arrival of the Authority's personnel, all patient care will be under the direction and control of the Authority.

5. TRANSPORT: The Rapid Responder shall not transport an emergency patient without the express authorization of the Authority. All patient transportation shall be at the direction and control of the Authority.

6. EQUIPMENT: The Authority may provide to the Rapid Responder certain minimal equipment and/or supplies depending on the resources available. Normal disposable supplies used in the treatment of patients may be replaced from the Authority's ambulance stock at no cost to the Rapid Responder. When the Authority furnishes supplies and equipment, the cost shall not exceed that which would normally be required in the treatment of patients.

7. INSURANCE: The Rapid Responder shall provide professional liability insurance in the amount deemed to be acceptable by the Authority (minimum of $1,000,000 of coverage annually) at its own expense, and shall name the Authority as an additional insured under said coverage. A certificate of insurance must be provided to the Authority each year on the renewal date of the insurance policy. Any new Fire Department applying to the Authority for acceptance as a Rapid Responder must provide the Authority with an acceptable certificate of insurance prior to final approval. Any part of this Agreement can be automatically revised or otherwise modified in order to comply with insurance coverage rules and restrictions.

8. GEOGRAPHICAL AREA: Rapid Responder shall be assigned a geographical area of operation by the Authority. This geographical area of response shall not be exclusive and responses outside of this assigned area without appropriate authorization shall be grounds for cancellation of this Agreement. The Rapid Responder must respond from within their assigned geographical area.

9. DESIGNATED REPRESENTATIVES: The Rapid Responder Group must appoint an individual to act as its designated representative for all matters arising from this Agreement. Such individual shall be designated in writing and shall be required to attend meetings as needed, at the Authority's office with the Authority's representative(s). Rapid Responder shall also designate in writing a team leader to assist the Authority with training. Rapid Responder shall limit the number of responding personnel to four (4) qualified individuals unless the Authority's representative requests additional manpower. Rapid Responder may also be dispatched on other medical calls where the arrival of the Authority's ambulance is determined to be excessive, or at the direction of an Authority representative. Rapid Responder understands and agrees that its designated representative under this Agreement will act as Rapid Responder Officer/Team Leader. Furthermore, it is agreed and understood that the Rapid Responder Officer/Team

28

Leader will have medical training, at a minimum, as a current EMT as designated by the State of West Virginia.

10. PATIENT RECORDS: Rapid Responder must maintain confidentiality of patient records or other documents and records as required by the Authority, and shall provide copies of patient records the Authority on a monthly basis or upon request or by an agreed procedure. The Authority shall furnish appropriate forms to accomplish these tasks. Rapid Responder shall fully comply by documenting 100% of its activities under this Agreement in the patient records required by the Authority.

11. QUALITY ASSURANCE: All Rapid Responder personnel are required to have on file with the Kanawha County Emergency Ambulance Authority the following:

a. Current roster of all qualified Rapid Responders including names, addresses, and telephone numbers.
b. Current copies of front and back of all certifications such as Paramedic, EMT-B, and First Responder & CPR-Health Care Provider.

The Authority's Medical Director shall review the performance of Rapid Responder personnel from time-to-time, and Rapid Responder shall cooperate in said reviews. If it is determined that any Rapid Responder personnel is not performing up to the standards of his or her certification(s), or otherwise represents a danger to or risk of inappropriate care to patients, the Authority in its reasonable discretion shall require the immediate removal of said personnel from the performance of Rapid Response services under this Agreement pending further training and/or competency review by the Medical Director.

12. TERMINATION: This Agreement shall remain in effect until terminated. The Authority may terminate the Agreement upon written notice if Rapid Responder materially violates the terms hereof.


KANAWHA COUNTY EMERGENCY AMBULANCE AUTHORITY

BY: _Monica Mason_

TITLE: Executive Director                    DATE: 8/9/2021


QUINCY VOLUNTEER FIRE DEPARTMENT

BY: _Joshua Vandygriff_

TITLE: _Chief_                    DATE: _8-5-2021_

29

# STATE OF WEST VIRGINIA

# EXECUTIVE DEPARTMENT

## At Charleston

## EXECUTIVE ORDER NO. 50-20

## By the Governor

WHEREAS, a State of Emergency was declared on the Sixteenth Day of March, Two Thousand Twenty for all counties in West Virginia (the "State of Emergency Declaration"), to allow agencies to coordinate and create necessary measures to prepare for and respond to the outbreak of respiratory disease caused by a novel coronavirus now known as COVID-19; and

WHEREAS, Chapter 15, Article 5, Section 6 of the Code of West Virginia authorizes the Governor to, among other things, control ingress and egress to and from a disaster area or an area where large-scale threat exists, the movement of persons within the area, and the occupancy of premises therein, and to perform and exercise other functions, powers, and duties that are necessary to promote and secure the safety and protection of the civilian population; and

WHEREAS, Executive Order 9-20 required all businesses and operations in West Virginia, except Essential Businesses and Operations as defined therein, to cease all activities within the state except for such minimum basic operations as are necessary to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or related functions, and the minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences, and provided exceptions for businesses such as home-based businesses and certain small businesses while requiring proper social distancing and hygiene practices be maintained at such businesses; and

30

WHEREAS, since the issuance of Executive Order 9-20 and other executive orders ordering closed or otherwise limiting occupancy of certain establishments and facilities in this state, implementation of successful public health measures has resulted in revised projections of rates of infection and COVID-19 related deaths in West Virginia, as well as over-strengthening supply chains for personal protective equipment and other medical equipment and supplies, resulting in greater preparedness and response capacity throughout the state; and

WHEREAS, on April 27, 2020, I, Governor Jim Justice, announced the state's reopening plan, West Virginia Strong. The Comeback (the "Comeback Plan"), to phase in the reopening of businesses in the state of West Virginia on a week by week basis to most effectively monitor and respond to the public health effects of this phased reopening, to be based upon certain metrics and conditions to safely reopen segments of West Virginia's economy and get our citizens back to work, while ensuring the health and protection of all West Virginians, and especially the state's significant older and vulnerable population who are at most risk from the COVID-19 virus; and

WHEREAS, Executive Order 23-20 and Executive Order 30-20 allowed for the resumption of all medical procedures throughout the state while requiring that hospitals and ambulatory surgical centers around the state limit procedures to only most urgent procedures to ensure adequate response capacity and preserve necessary personal protective equipment and other resources at such facilities in the event of any surge of COVID-19; and

WHEREAS, under the Comeback Plan, the phased reopening of businesses and activities in West Virginia has allowed our public health experts to effectively monitor the numbers of cases and rate of spread of the virus within this State and across the nation, and to make recommendations based upon the most current data available; and

WHEREAS, West Virginia's public health experts have advised that mandating the use of face coverings when in confined, indoor spaces, other than one's residence or when actively engaged in the consumption of food and/or beverage, and when not able to adequately social distance from other individuals who do not reside in the same household, is appropriate at this time; and

31

4

wearing a face covering to protect themselves and the community against the spread
of COVID-19, in accordance with this Order.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the
State of West Virginia to be affixed.



By the Governor

DONE at the Capitol in the City of
Charleston, State of West Virginia, this Sixth
day of July, in the year of our Lord, Two
Thousand Twenty in the One Hundred Fifty-
eighth year of the State.

GOVERNOR

SECRETARY OF STATE

# MEMBERSHIP

a)  No person will be permitted to join the Jefferson Volunteer Fire Department who can't effectively demonstrate and complete all tasks required.

b)  Prospective members will provide (3) personal references on the date of application. Members will have a criminal background check done by the department.

c)  Training drills will be held on the first (3) Mondays of each month, all members will be required to attend at least (2) of those training drills a month.
On the last Monday of every month the fire department will conduct a business meeting.

d)  All members will be assigned to a fire apparatus for Monday night inspections.

e)  Makeup drills will be conducted as needed.

f)  Any member who quits or resigns from the fire department due to anger or disagreement will have (1) month to wait before reapplying for membership.

g)  A leave of absence may be granted to any member by the Fire Chief for any valid reason, for up to (1) year maximum.

h)  The membership of the fire department will be determined by the Fire Chief . The department shall consist of persons approved, without regard to race, sex, or national origin, must be able-bodied and a citizen of the USA. Must be 16 years of age.

i)  All new member will have a (6) month probationary period to complete.

j)  After members have completed required training, they will be evaluated by the training officer on their knowledge before ending probation.

k)  New members will be presented to the Board of Directors by the Fire Chief.

l)  New members will have (1) year to take and complete required training.

m)  new members unable and unwilling to attend required training courses, may be subject to removal from the department.

n)  All members will carry out orders of the Officers to the best of his / her ability without putting their selves in danger.

o)  Members in good standing with the fire department will be qualified as an "Active Member"

p)  Regular Fire Department drills will be held each Monday night except for Special Holidays, from 7pm to 10pm. Specified meetings and drills will be held as necessary.

q)  Members will work with the Officers to obtain the best Fire / Rescue protection as possible.

r)  No person will be permitted to become a member if they belong to any other Volunteer Fire Department.

s)  All members shall work to gain the interest of others to become a member of the department to help provide a service to the community.

33

## MEMBERSHIP CONTINUE

s)  All members shall work to gain the interest of others to become a member of the department to help provide a service to the community.

t)  A personnel and training file will be kept on each member.

u)  All firefighters are required to have (12) hours of continuing education each year

v)  The Fire Department will have the most experienced and certified person to take charge at emergency scenes if no officer is present.

w)  At no time will any children be permitted in the fire station without being supervised by an adult or member of the department.

x)  All members of the Fire Department will be issued a copy of the Standard Operating Procedures. Anytime a procedure has been revised a copy will be issued to each member. Each member will be required to update their issued copy.   *I was not given a copy. They did not discuss the Rules with me.*

y)  Firefighters that are selected by the fire chief in August to serve as annual board members must be in good standing and an active member. A list will be submitted to the board for approval at the annual meeting. Board members with vote on three (3) firefighters.

Revised: June 28, 2006

JEFFERSON VOLUNTEER FIRE DEPARTMENT

34

## PUMP OPERATORS AND DRIVERS

**Must Meet**

a)  Will have a drivers license check annually.
b)  Must have been an active member of the department for one (1) year.
c)  Must be off probation.
d)  Must be 18 to perform drivers training only
e)  Must be 21 to be a first out driver

*I am a CERTIFIED Fire Fighter*

## TRAINING and EDUCATION

All drivers, regardless of age, experience or maturity, need to be trained to understand the laws and legal liabilities associated with operating an emergency vehicle. Additionally, all drivers need to have continuing and on-going refresher training to keep their skill and knowledge levels high, as well as, to identify and correct any deficiencies or bad habits that have developed. This applies to behind-the-wheel and class room training.

1) Successful completion of a recognized emergency vehicle driver training program which would include but not be limited to:

a)  A minimum of 4 hours of classroom training concentrating on defensive driving, legal aspects of emergency vehicle operations, physical dynamics and review of departmental emergency vehicle response guidelines (SOP'S) Written competency testing strongly recommended.

b)  10 hours of documented behind-the-wheel training (initial vehicle and each different style of vehicle) Final road test with training / qualifying officer.

c)  Annual re-training until qualified as a front line driver.

d)  Annual classroom refresher training. Focus on defensive driving, legal aspects of emergency vehicle operations, physical dynamics and review of departmental emergency vehicle response guidelines (SOP's)

e)  Behind-the-wheel re-training and / or re-certification, not less than every 3 years for all drivers.

f)  Drivers returning to driving duties from suspension of privileges and / or returning to active status after inactive for more than 6 months should be required to re-certify on the apparatus or vehicles previously qualified on.

## MUST KNOW

a)  How to perform preventive maintenance on all fire department vehicles.
b)  All state , county and local laws.
c)  Shall identify all mechanical parts of the vehicles.
d)  Must know all water and hydrant locations.
e)  Must know all streets and road locations.

Revised: May 13, 2006

FILED

FEB 16 2022

WV HUMAN RIGHTS
COMMISSION

35

# EMERGENCY VEHICLE PERMIT
## PRIVATE VEHICLES

## GENERAL

Each member responding in an emergency situation must have complete control of their physical and mental capabilities. Anyone responding in an emergency while under the infuence of alcohol or drugs is risking their own safety, the safety of their fellow members and the public they are tring to protect

## MEMBERSHIP

Must have been an active member for one (1) year and off probation

## DRILL ATTENDANCE

Must attend two (2) excused drills a month

## EMERGENCY CALLS

Must maintain 50% of all calls a month

## DRIVING RECORD CHECK

Must have a drivers license check annually

## DEFENSIVE DRIVING COURSE

Must have taken the fire department drivers training course.

## TRAINING

Must have taken Firefighter I , Haz. Mat. , First Aid and CPR , Incident Command or NIMS.

Revised:      May 13, 2006

36

## Requirements For Vehicle Operators (age 65 and older)

Drivers over age sixty-five (65) should not be permitted to drive an emergency vehicle in emergency situations. If it is necessary for an individual over sixty-five (65) to operate emergency vehicles, the following must be adhered to:

1.  Meet all requirements for operators in the twenty-one (21) to sixty-five (65) year class (see Evaluation Requirements, page 24).

2.  An annual physical shall be completed by a licensed physician stating the operator is physically capable of driving an *Emergency Vehicle* in an emergency situation. A signed copy of the completed physical examination must be kept in the member's file. The physical should include, but not be limited to, that the member:

    a)  Has no impairment of the use of foot, leg, hand, arm or fingertips, or any other structural defect or limitation likely to interfere with safe driving.
    b)  Does not have diabetes mellitus to a degree presently requiring the use of insulin for control.
    c)  Has no heart condition likely to cause loss of consciousness or sudden death.
    d)  Has no respiratory ailment likely to interfere with safe driving.
    e)  Has no arthritic, rheumatic, muscular or vascular condition which interferes with the ability to drive safely.
    f)  Does not have epilepsy or any other condition likely to cause sudden loss of consciousness or loss of ability to control a vehicle.
    g)  Has no mental, nervous, organic, or functional disease, or any psychiatric condition likely to interfere with safe driving.
    h)  Meets the following minimum vision requirements - at least 20/40 (Snellen) in each eye and in both eyes together, with or without glasses; at least seventy (70) degrees side vision in each eye; the ability to distinguish red, green and yellow (or amber).
    i)  Meets hearing requirements by perceiving a forced whisper at five (5) feet with the better ear, or meet specified requirements as measured by a testing device, with or without a hearing aid.
    j)  Be evaluated to determine that any medication, if taken, would not result in any chemical impairment and impair their ability to operate the emergency vehicle.
    k)  Must not be diagnosed as an alcoholic.

3.  A copy of the Physician's Certificate must be sent to VFIS.

## Department of Motor Vehicles Transcript Evaluation Requirements

### Class A Violation

An individual who has a Class A violation within the past three (3) years normally receives a license suspension from the Department of Motor Vehicles which issued the license. In addition, VFIS guidelines call for suspension of driving privileges for anyone convicted of a Class A violation for a period of eighteen (18) months. Additionally, any of these individuals would also be required to attend an approved driver-improvement program, or equivalent training, and be recertified to operate emergency vehicles.

### Class B Violation (21-65)

Any individual who has a combination of two (2) Class B moving violation convictions and/or chargeable accidents in a three (3) year period will be issued a warning letter from the chief officer or administrative officer of the Emergency Service Organization.

Any individual who has a combination of three (3) moving violation convictions and/or chargeable accidents in a three (3) year period will be issued a suspension of driving department vehicles for a period of ninety (90) days by the chief officer or administrative officer of the Emergency Service Organization.

Form MCSA-5876

OMB No. 2126-0006    Expiration Date: 03/31/2025

## Medical Examiner's Certificate
### (for Commercial Driver Medical Certification)

**Public Burden Statement**
A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0006. Public reporting for this collection of information is estimated to be approximately one minute per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, 1200 New Jersey Avenue, SE, Washington, D.C. 20590.

U.S. Department of Transportation
Federal Motor Carrier
Safety Administration

I certify that I have examined **Last Name:** _Spainhour_    **First Name:** _Patrick_    in accordance with (please check only one):

- ☑ the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and, with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when (check all that apply) **OR**
- ○ the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) with any applicable State variances (which will only be valid for intrastate operations), and, with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when (check all that apply):

- ☐ Wearing corrective lenses
- ☐ Wearing hearing aid
- ☐ Accompanied by a ___ waiver/exemption
- ☐ Accompanied by a Skill Performance Evaluation (SPE) Certificate

- ☐ Driving within an exempt intracity zone (49 CFR 391.62) (Federal)
- ☐ Qualified by operation of 49 CFR 391.64 (Federal)
- ☐ Grandfathered from State requirements (State)

The information I have provided regarding this physical examination is true and complete. A complete Medical Examination Report Form, MCSA-5875, with any attachments, embodies my findings completely and correctly, and is on file in my office.

**Medical Examiner's Certificate Expiration Date**
_01|20|2026_

| **Medical Examiner's Name** (please print or type) | **Medical Examiner's Telephone Number** | **Date Certificate Signed** |
|---|---|---|
| _Sarah Knight FNP_ | _304-746-3323_ | _01|20|2024_ |

- ○ MD    ○ Physician Assistant
- ○ DO    ☒ Advanced Practice Nurse
- ○ Chiropractor    ○ Other Practitioner (specify)

**Medical Examiner's Signature**    _Sarah Knight FNP_

**Medical Examiner's State License, Certificate, or Registration Number**
_APN 76122_

| **Issuing State** | **National Registry Number** |
|---|---|
| _WV_ | _6778141958_ |

**Driver's Signature**

**Driver's License Number** _D1023372_    **Issuing State/Province** _WV_

**Driver's Address**

**Street Address:** _514 22 Mos 51_    **City:** _Dunbar_    **State/Province:** _WV_    **Zip Code:** _25064_    **CLP/CDL Applicant/Holder** ☑ Yes  ○ No

**This document contains sensitive information and is for official use only. Improper handling of this information could negatively affect individuals. Handle and secure this information appropriately to prevent inadvertent disclosure by keeping the documents under the control of authorized persons. Properly dispose of this document when no longer required to be maintained by regulatory requirements.**

Rev 3/29/22



Handwritten notes (right margin):

WV possession of a prescription drug without a current prescription is a misdemeanor felony (15 V/S)

DEA Classification possession with the intent to distribute (drug diversion)

Penetrating out of scope

Resulting in

**USPS Certified Mail Receipt / Return Receipt card**

3811, July 2020 PSN 7530-02-000-9053        Domestic Return Receipt

7021 0350 0001 9251 8967

U.S. Postal Service
CERTIFIED MAIL RECEIPT

Charleston WV 25301

Tracking #:
7021035000192518967
Return Receipt                    $3.05
Tracking #:
9590 9402 7060 1251 3692 46
Total                             $8.56

Grand Total:                      $8.56

Debit Card Remitted               $8.56
    Card Name: VISA
    Account #: XXXXXXXXXXXX7058
    Approval #: 127407
    Transaction #: 045
    Receipt #: 024142
    Debit Card Purchase: $8.56
    AID: A0000000980840         Chip
    AL: US DEBIT
    PIN: Verified

39

**From:** CW Sigman
**Sent:** Wednesday, January 27, 2021 6:46 PM
**To:** patrick spainhour
**Subject:** Re: Covid 19

Will send it in

C.W. Sigman
Director
Kanawha County OEM
Office 3043570991
Cell 3045502819

On Jan 27, 2021, at 4:48 PM, patrick spainhour <pgs2402@hotmail.com> wrote:

Patrick G Spainhour, ~~                ~~ 514 22nd ST, Dunbar WV, 25064    Phone 304 543-8917   "credentials on request", Thanks

Sent from Mail for Windows 10

I Talked to
Cw Sigman  304 550 2819
He told me on
8-6-21 & 10-4-21  (9min 56 sec)
That there were
no Radio Responses
in Kanawha Co - ALIE
He told me that He took
a contract to Jefferson
from Kanawha to sign.

I talked to Cw Sigman
He told me twice
that there were no
FM & Radio Responses
and True. This Rose Done
on 8-6-21 and 10-6-21
He Also Told me that He
Pushes a contract or
Agreement to Jefferson
VFD from Kanawha County
It was Signed by the Jefferson
Fire chief on Aug 6 2021
Jon Vandergriff

40

# JEFFERSON VOLUNTEER FIRE DEPARTMENT

The department began with a balance of $223,672.37 in its state account on January 1, 2018. During the period audited, the department received $53,353.05 in quarterly allotments disbursed by the W.Va. State Treasurer and deposited $13,450.00 in refunds in its state account. Thus, the total amount of funds audited for the period was $290,475.42.

The audit of Jefferson VFD, in Kanawha County, found the department to be in non-compliance with W.Va. Code. This was due to the department making a $2,253.00 expenditure not in compliance with W.Va. Code §8-15-8b. Items or services the department purchased that are not permissible included: accident and sickness insurance.

The department's financial activity in the state account during the audit period, including amounts audited, accounted for, and not in compliance with W.Va. Code, are summarized in the table below.

| Table 34 – JEFFERSON VFD State Funds Audited – Calendar Year 2018 | | |
|---|---|---|
| **State Account Deposits** | | |
| Beginning Balance | $223,672.37 | |
| State Treasurer Deposits | $53,353.05 | |
| Additional Deposits | $13,450.00 | |
| Total Funds Audited | | $290,475.42 |
| | | |
| **State Account Expenditures** | | |
| Proper Expenditures | $56,167.87 | |
| Unallowable Expenditures | $2,253.00 | |
| Total Expenditures | | $58,420.87 |
| | | |
| Balance Remaining in State Account | | $232,054.55 |

## Recommendations Made to the Department

1.  The Legislative Auditor recommends the department reimburse the state account a total of $2,253.00 for the purchase not permitted by W.VA. Code §8-15-8b.

2.  The Legislative Auditor recommends the department cease expending monies from the state account for items or services not permitted by W.VA. Code §8-15-8b.

The findings and recommendations detailed above have been reviewed and discussed with the Jefferson VFD. The department is in the process of complying with the recommendations.

Dear Mr. Mark Ford,

My name is as you know is Patrick G. Spainhour, I am sure that you are familiar with my Fire and EMS history.

I see a great potential in our Fire Dept and its members for our community.

I have been a member of Jefferson Fire Dept. for over fifteen weeks and have participated in every drill and responded to every alarm when free to do so.

I have, with the permission of those above me acted in a proactive manner and repaired water fire extinguishers, replaced their pins and chains as well as recharging them.

Unit 194, the tanker had no proper connection to keep the airline connected to the to the unit and a very dangerous electrical connection that had to potential to cause great harm to the firefighters and a liability to the officers and board members, I Asked the assistant Chief about it and he hinted that a Auto Eject was going to be put on it, I feel that he was hinting for me to buy it and install it, however I researched the parts needed to safely repair the electrical system, purchased them and installed it correctly and safely on 194.

I have followed through on all task that were assigned to me on drill nights and the limited times that I made it to get on an apparatus.

In becoming familiar with what was on each apparatus, I observed expensive tool boxes and the two bags of battery-operated tools (with dead batteries at one time) and pondered their functional use.

One unit has two generators on it.

In observing the stations equipment and operations I never noticed apparatus fluids being checked or any other maintenance being done on them on drill nights.

The cross lays on 194, 192 and 193 have a mixture of smooth boors on them, all of the tips are beyond the ranges for those lines, greatly overworking the firefighters, all 1 ¾ lines by the fire service training are to have a nozzle opening no bigger than ½ of their diameter, a 7/8 tip (161 gpm @ 50 PSI), and the one 2-inch line a 1-inch tip is needed; some of the lines have a 1 ¼ tip, which belong on a 2 ½ or better a master stream.

It would be productive to have at least one line on 192's and 193's cross-lays with a 95-gpm fog nozzle for protection of motor vehicle occupants and fire extinguishment; if we apply foam with our inline inductors which are 95 gpm, the nozzle has to match, and is ran @ 200 psi.

The bumper line on 193 is a 150-gpm fog nozzle, a lot of gpm for a motor vehicle fire and to use class B AFFF/ATC we would need a 95- gpm nozzle on this line. 194 has a 95- gpm nozzle @ the driver's side pump panel.

193's exhaust system is broken into under the apparatus allowing exhaust gases to potentially enter the cab.

193' foam system will not pump foam into the tank, I provided an external foam pump to pump it into 193's tank at the request of the Assistant Chief and Chad Smarr.

In observing Chads use of 193's foam system on a trailer fire I asked him what % he was using, he said that he was using 3%, While studying the training materials it is stated that the foam system is limited to (0.1- 0.9%) when using class A foam (300 gpm max) and when using class B foam the 3% setting @ 100 gpm or less ( 95 gpm ideally) this, when fighting small hydrocarbon fires and to use our class B foam on polar solvents we would have to use our 95 gpm inline inductors @ 6% (100 gpm or less @ 200 psi with a 95 gpm nozzle. I mentioned this to the Assistant Chief but I am not sure if it went anywhere.

The Fire Dept. has purchased two TV's, they are bolted them to the steel on each end of the bay so that incoming staff can see the who and what, would one of done in the center of the bay and lower, as of this letter I am not sure that the signal gets to them. We, need an exhaust extractor more urgently for the apparatus, magnetic or pneumatically secured to the exhaust, because fire fighters have two times the incidence of cancer, often the apparatus is left in the bay and its motorized equipment started and run to test them building up the exhaust gases that the firefighters breath.

193's equipment door is damaged and will not open to access it's equipment.

192 or 194 also has an equipment door that will not open to access its equipment.

I asked the Assistant chief if our regulators for both the air-chisel and air bags had 2216 low pressure regulators, "he said that he had not thought about it." I strongly suspect that the current high pressure air cylinders, (4500 psi) cannot be used with those systems as it would damage and destroy them, essentially our airbags and air-chisels are useless if this is true.

One drill, four of were involved in what was to of been hose testing on some new orange 1 ¾ hose, I rolled up approximately 400 feet of hose and placed 600 feet into the bed off the pick-up during this drill. As for testing the hose, never in the years that I have been on three previous fire depts have I seen hose testing, or the lack of it done in this manner, this has the potential only bite us in the future.

I have been participating on our fire Dept for over fifteen drills yet I have not even been introduced to the pick-up truck, I have however, "through necessity" have pumped 193's pump on a mutual aid call for a short while. While standing by the driver's door with the truck in pump, our Lt. took the truck out of pump (grinding), I believe that if I had not placed the wheel chock under the wheel 193 potentially could have taken off down the road.

I believe that I have something to offer our Fire Dept and Community based on my over fifty years in the fire service, my records speak for me.

In June of this year, I applied for an Emergency Vehicle Permit, the Fire Marshalls office received the completed paperwork on June the twenty-fourth and processed it on June the twenty-eight, as of this letter I still don't have the permit, I can't do my job if I can't make the apparatus, usually I am waiting for the units to return.

43

I have talked to the Chief about the permit and he said that it is in his office, I asked to be considered for the open Lieutenants position based on my credentials, so far, I have got no response. I have spent hundreds of dollars for and towards our Fire Dept. and have asked for nothing but respect.

With all due respect:

Patrick Spainhour, RN, CPhT, NRP, WV EMT-P, HM1-USNR-R